**Below is a Memorandum Decision of the Court.**

_[signature]_
_____
**Christopher M. Alston**
**U.S. Bankruptcy Judge**
**(Dated as of Entered on Docket date above)**

Christopher M. Alston
Bankruptcy Judge
United States Courthouse
700 Stewart Street, Suite 6301
Seattle, WA 98101
206-370-5330

## IN THE UNITED STATES BANKRUPTCY COURT FOR THE
## WESTERN DISTRICT OF WASHINGTON AT SEATTLE

| | |
|---|---|
| In re | Chapter 7 |
| ALANNA GRACE ELLIS, | Case No. 16-10066-CMA |
| Debtor. | |
| UNITED STATES TRUSTEE, | Adv. Case No. 17-01017-CMA |
| Plaintiff, | |
| v. | |
| ALANNA ELLIS, | MEMORANDUM DECISION |
| Defendant. | |

The Court conducted a bench trial in this adversary proceeding on April 24, 25, and 27, 2018. Martin L. Smith and Sarah R. Flynn represented the Office of the United States Trustee (the "Plaintiff" or the "U.S. Trustee"). Donald A. Bailey represented Defendant Alanna G. Ellis

MEMORANDUM DECISION - 1

("Alanna"[1]).  The Court heard closing arguments on May 2, 2018, and then took the matter under advisement.

At trial, the U.S. Trustee asserted that during the chapter 11 case Alanna secretly diverted post-petition mortgage services income that was property of the bankruptcy estate to her non-debtor spouse's sole-member limited liability company.  The U.S. Trustee contended that Alanna fraudulently concealed these transfers, failed to maintain records that support her claims that the income was not property of the estate, and made false oaths to deceive interested parties.  Alanna argued that she reasonably believed that the income transferred to the company was not property of the estate, and any improper transfer was not intentionally fraudulent.  She asserted she made a good faith attempt to supply information she thought was required, she never intentionally made false statements in her various filings, and she maintained adequate records of the relevant financial transactions.

For the reasons stated below, the Court finds and concludes that Alanna intentionally and fraudulently disposed of property of the estate during the case, failed to keep recorded information from which her financial condition might be ascertained, and knowingly and fraudulently misled her creditors and the trustee appointed in the case.   The Court will enter judgement against Alanna denying her a discharge under 11 U.S.C. §§ 727(a)(2), (a)(3), and (a)(4).[2]

## I.  **FINDINGS OF FACT**

A.  <u>Alanna and Bradley Work for Many Years in the Mortgage Industry.</u>

Alanna and Bradley Ellis ("Bradley") married in 2002 and at all relevant times resided in the State of Washington.  Alanna and Bradley did not execute a prenuptial agreement or separate property agreement in connection with their marriage.

---

[1]  The defendant, her husband, and the chapter 7 trustee all have the last name of Ellis.  To avoid confusion, the Court will refer to the defendant and to her husband by their first names.  The Court does not intend any disrespect to the parties.

[2]  In addition to the foregoing, any and all findings of fact and conclusions of law orally set forth on the record at the time of the trial are hereby adopted and incorporated herein pursuant to Fed. R. Civ. P. 52(a) and Fed. R. Bankr. P. 7052.

Alanna has worked in the mortgage and lending industry in various capacities since approximately 1997.  In the early 2000's, Bradley entered the mortgage industry as well.  Since their marriage in 2002, Bradley and Alanna have often worked at the same companies on residential and commercial mortgage transactions, including at Money Tree, Charter Funding (a division of First Magnus Financial Corporation), Sterling Savings Bank/Golf Mortgage, Pinnacle Mortgage, and, most recently, OnQ Financial.

In 2007, Bradley formed a limited liability company, IPG Investments, LLC ("IPG LLC"), to originate commercial mortgage transactions.  Bradley was the sole member of IPG LLC.  Due to the failure to pay the annual fee due to the State of Washington, IPG LLC became inactive as a limited liability company in November 2011.  Alanna and Bradley continued to provide services to customers under the name of IPG or IPG Investments ("IPG") without the protections or obligations of a limited liability company.  During all periods relevant to this proceeding, there was no bank account in the name of IPG, and Alanna and Bradley did not segregate commissions and fees generated by IPG-related services in any bank account.  Alanna testified that all IPG business emanated from past clients or referrals from clients, realtors, or business associations.

At trial, Alanna and Bradley explained that mortgage companies are sales businesses that generate monies by performing services for clients. While every company has a different standard, loan originators bring in the clients.  Loan processors process all the paperwork, work with underwriters, and communicate with loan officers.  Originators still maintain involvement in the transaction to make sure loans close.  In sum, there would be no business without a loan broker, but there would no commissions without a loan processor, and every mortgage company has both departments.  Bradley noted that the originator typically receives 50–80 percent of the commission from a given transaction, while loan processors typically make between minimum wage and $60,000 per year.

MEMORANDUM DECISION - 3

B.   Bradley Forms a New Company to Operate a Recreational Vehicle Resort.

In late 2013, Bradley suffered a heart attack.  He decided to "back out" of the residential mortgage industry and do something he thought would be more fun: operate a recreational vehicle resort.

In June 2014, Bradley formed Smokiam RV Resort, LLC ("Smokiam"), a Washington limited liability company.  Smokiam owns a 13.87-acre parcel of real property near Soap Lake, Washington[3], where it operates a recreational vehicle park and campsite.  Smokiam purchased the property in 2014.  In 2016, the Smokiam property was in the midst of a major renovation and upgrade.

Smokiam is the named account holder on a financial account at Umpqua Bank, xxx8929 (the "Smokiam Account").  Alanna opened the Smokiam Account, she is the only signatory on the Smokiam Account, and she handles Smokiam's books, records, and bills.  Alanna received a Form W-2 from Smokiam showing $14,800 in wages, tips, and other compensation paid in 2016.

According to Smokiam's operating agreement, Bradley is the sole member of Smokiam. However, when Alanna opened the Smokiam Account, she certified in a Signature Card/Account Agreement and Limited Liability Company Authorization Resolution that she was the managing member of Smokiam.  P-54.  At trial, Alanna testified that she did not carefully review the paperwork and that she has never been the managing member of Smokiam.  In any event, Alanna and Bradley agree that the limited liability interests in Smokiam constitute community property.

C.   Alanna and Bradley Have Significant Experience with Bankruptcy Proceedings.

Prior to his entry into the mortgage brokerage industry, Bradley practiced law in the state of Washington.  As a lawyer, he represented both creditors and debtors in consumer bankruptcy cases.

Alanna also had exposure to the Bankruptcy Court—as debtor in seven separate cases.  In 2000, she filed a chapter 13 case that the Court dismissed (due to failure to file required

---

[3]  Soap Lake is approximately 163.5 miles from the home of Alanna and Bradley in Issaquah.

MEMORANDUM DECISION - 4

information) and then a chapter 7 case that the Court also dismissed (for failure to pay the filing fee.)  Notably, Bradley filed both of those cases on her behalf.

With the assistance of counsel, she filed a case under chapter 7 in 2002, and she received a discharge.  Seven years later, she filed her fourth case under chapter 13 *pro se*.  She converted that case to chapter 11, and the case was later converted to chapter 7 in June 2010.  In an adversary proceeding commenced by the U.S. Trustee, Alanna stipulated to the entry of an order denying her a discharge under § 727(a)(8) based on the fact that she had received a discharge in a case seven years prior.

She filed a fifth case in July 2014 with the assistance of counsel.  The Court dismissed the case two months later for failure to file required information.  Alanna filed her sixth case pro se in February 2015, and the Court dismissed this case the month for failure to pay filing fee and to file information.

Even though Alanna filed five cases while married to Bradley (four described above plus her current case), he has never filed for bankruptcy protection with her or separately.

D.   In Her Latest Case, Alanna Makes a Number of Disclosures About Her Assets, Income and Reorganization Plan.

On January 8, 2016, Alanna filed her seventh case, this time under chapter 11 (the "Chapter 11 Case") with assistance of Larry Feinstein.  Alanna asserted in the petition that her debts are primarily consumer debts.  Apparently, she filed this case without informing Bradley. He testified that he was not involved in the decision to file bankruptcy and he learned about Alanna's case when he received a notice in the mail of the Section 341 meeting of creditors.

In conjunction with the Chapter 11 Case, the Defendant filed schedules of assets and liabilities (each an "Initial Schedule" and collectively, the "Initial Schedules"), and a statement of financial affairs (the "Initial SOFA").  The Defendant signed the Initial Schedules and Initial SOFA under penalty of perjury as being true and correct.  These documents include the following representations:

1.     On her Initial Schedule A/B, Alanna states under "Interests in partnerships or joint ventures" that she is the 100% owner of "IPG Investments, LLC (mortgage brokerage)" and values her interest in IPG at $1,000.

2.     On Initial Schedule A/B, under "Any business-related property you did not already list," Alanna identifies an interest in Smokiam, valuing the asset at $1,600,000, and describing the asset as follows: "Smokiam RV Resort LLC (debtor and husband's 100% member LLC)."

3.     On her Initial Schedule I, Alanna declares that she and Bradley are both Mortgage Brokers employed by OnQ Financial.  In Part 2 of the schedule, which requires the debtor to state estimated monthly income as of the date the form is filed, Alanna states that her gross monthly wages are $2,500.  She also discloses, in answer to question 8 on the schedule, that she regularly receives $9,285 in net income each month from operating a business.  As for her non-filing spouse Bradley, she states his gross monthly wages are $5,451 and that he regularly receives $2,750 in net income from operating a business.

4.     Alanna states on her Chapter 11 Statement of Your Current Monthly Income that her monthly gross wages, salary, tips, bonuses, overtime, and commissions totaled $10,522.  P-2.

    About a month after commencing her case, Alanna filed a report that is required for debtors who claim to hold a substantial or controlling interest in an entity.  In this report, Alanna states that she holds a substantial or controlling interest in two entities: IPG Investment, LLC and Smokiam RV Resort, LLC.  D-24.  She describes her interest in both entities as follows: "Debtor-0%; Husband 100%."  D-24.  In this form, Alanna restates an estimated value of $1.6 million for Smokiam and declares, "IPG Investments is a sole proprietorship of my husband that originates commercial mortgages and loans for real estate businesses."

    At the chapter 11 meeting of creditors held on February 12, 2016, Alanna stated that the $9,285 in net income disclosed in the answer to Question 8 on Initial Schedule I was from the IPG business.  P-4 at 23.  Alanna confirmed at the meeting that her IPG income was $9,285 per month:

THE TRUSTEE: And when we see -- when we look at your income numbers, is that -- that's when we see income from operating a business, it's coming from that business?

MS. ELLIS: If it's listed on under my section and not on my husband's side, that would be correct.

THE TRUSTEE: There's about $9,285 a month.

MS. ELLIS: That's correct.

P-4 at 23. Alanna further testified at the 341 meeting that she and her husband had not used the Smokiam Account personal or family expenses. P-4 at 31. Finally, Alanna's attorney outlined her chapter 11 plan:

THE TRUSTEE: And what is the purpose -- or what is the goal of this bankruptcy case, as far as going forward? And Mr. Feinstein can help out here as far as legal strategy and things like that.

MR. FEINSTEIN: Well, it's going to be -- excuse me --it's going to be basically a Chapter 13. Under 1129 in the bankruptcy code, an individual debtor in Chapter 11 has to propose a plan to pay their best efforts over a period of up to 60 months. And we're going to put together a budget and income expense statement projected out and offer the creditors basically the Chapter 13 -- you know, under 1129, we have to pay the creditors our best efforts anyway. So it's just an ability to take all these debts, kind of clean them up, put them in a structured payment plan, get them paid back, whatever we can get them paid back, and get on with it.

P-4 at 5-7.

Notably, Alanna did not disclose at this meeting any intention or plan to funnel any income from the mortgage business to her husband's RV resort business.

About two months later, Alanna amended several of her initial filings. On the Amended Schedule A, she again lists her interest in IPG Investments, but describes the asset as follows: "IPG Investments (mortgage brokerage). This was an LLC but became inactive with Sec. of State, and now operates as a sole proprietorship." She again states she owns 100% of the interest in this asset and values it at $1,000. P-3 at 6. She also restates her interest in Smokiam, again declaring the asset is worth $1.6 million but providing a new description of her interest as well: "Smokiam RV Resort LLC husband's 100% member LLC). Husband is 100% member, but it is a community asset and not held as his separate estate." P-3 at 7.

E.      Shortly After Filing Her Latest Case, the Court Orders the Appointment of a Trustee.

On April 27, 2016, the Court ordered the appointment of a trustee in the Chapter 11 Case. The U.S. Trustee appointed the Kathryn Ellis (the "Trustee") to serve as the trustee in the Chapter 11 Case. The Court entered an order approving the Trustee's appointment on May 4, 2016.

F.      During the First Eight Months of the Chapter 11 Case, Alanna and Bradley Generate Almost $200,000 in Commissions from the Mortgage Business.

Between January and August in 2016, Alanna and Bradley closed eight transactions doing business as IPG that generated a little less than $200,000. They provided services to the following customers and earned the following amounts:

1.      Michael and Liana Keller for the financing of property in California (the "Keller Transaction"). On February 22, 2016, the Kellers' financing closed and fees totaling $55,500 became payable. Alanna testified the Kellers were past clients of Bradley.

2.      Marie McDonough, a California resident, for the financing of property in California (the "Mammoth Lake Transaction"). The transaction closed on or around March 2, 2016, and fees and commissions totaling $10,335 became due and payable.

3.      William K. Cahill and/or his company, Beacon Plumbing, in connection with the financing of property in Kent, Washington (the "Cahill Transaction"). On April 29, 2016, two days after the Court had ordered the appointment of a chapter 11 trustee, the Cahill Transaction closed and a fee of $25,400 became payable.

4.      Ms. McDonough, in connection with certain financing, generating a referral fee of $2,570 (the "First McDonough Transaction").

5.      Ms. McDonough, again, this time in connection with the financing of certain other property in California (the "Second McDonough Transaction"). This transaction closed on or about May 26, 2016, and fees and commissions totaling $65,800 were due and payable.

6.      Sonny Ristick for the financing of property in Oregon (the "Ristick Transaction"). This transaction closed on or around July 5, 2016, and fees and commissions totaling $8,600 were due and payable. Another client referred Mr. Ristick to Alanna and Bradley.

7.      Ms. McDonough, yet again, for services in connection with another transaction (the "Third McDonough Transaction"). This transaction closed on or around July 26, 2016, and generated a referral fee of $13,220.

8.      Arleen Arzola in connection with the financing of property in California (the "Arzola Transaction"). On July 28, 2016, Ms. Arzola's financing closed and a fee of $11,836 became payable.

These eight transactions resulted in fee and commissions of $193,236 for the IPG business. Alanna performed the loan processing in all of the transactions.

G.      Alanna Represents that She Earns Healthy Commissions from the Mortgage Business but Diverts Virtually All of the Monies to Bradley's Resort Business.

Shortly after the appointment of the Trustee, Alanna and her counsel sent a number of emails responding to requests of the Trustee for information about the IPG and Smokiam businesses. In these emails, Alanna identified a number of transactions that would generate commission for the IPG business. Alanna, through her counsel, represented that she was receiving substantial income from the business. D-27 and D-32. For example, in an email dated May 12, 2016, Alanna's counsel attaches a spreadsheet from Alanna showing $93,000 in IPG income year-to-date and another $135,000 in commissions expected in the third quarter. D-27. In another email dated May 31, 2016, Alanna's counsel represented to the Trustee that Alanna "received a significant commission last Tuesday from IPG Investments." D-32. In neither of these emails, nor in any other emails, did Alanna or her counsel inform the Trustee that Alanna was directing the IPG fees and commissions to the Smokiam Account. The Court also notes that Alanna informed her attorney in an April 29, 2016 email that she has been "quite busy with IPG business so income is looking good" and that she had made $28,000 in commissions so far that month "that's paying out to me next week." P-55. Alanna testified that her attorney's statement that Alanna received a significant commission was not correct, and the commission described in her May email never materialized because the transaction did not close.

The Court does not find Alanna's testimony credible. The IPG business generated a $25,800 commission in April (paid in early May) and a $65,800 commission at the end of May—

payouts that are consistent with the emails. Alanna was busy with IPG business and generating some significant earnings. The Trustee would later, learn, however, that very little of these monies were coming into Alanna's account. The Court finds Alanna made representations to create the impression that Alanna was earning regular and meaningful income from the IPG business. Since Alanna's stated intent was to propose a "super chapter 13 plan," Alanna needed everyone to believe that she earned regular income to confirm such a plan.

While claiming that the IPG business was generating significant commissions for her, Alanna and Bradley directed 100% of the commissions and fees earned for IPG-related services on six of the eight transactions described above to the Smokiam Account.

1.      On February 23, 2016, the closing agent wired the Keller fees/commissions due to the Smokiam Account (the "Keller Transfer"). Notably, the Smokiam Account had a negative balance of $428.28 the day before the wire transfer. Although Alanna attached the February statement for the Smokiam Account to the monthly operating report for February 2016, she did not indicate anywhere on the report that the $55,000 deposit represented income for IPG-related services.

2.      The Court ordered the appointment of a chapter 11 trustee on April 21, 2016. On April 29 (the same date as the email from Alanna to her attorney describing the $28,000 in commissions "paying out to me next week"), Alanna sent a letter to the closing agent for the Cahill Transaction. The letter instructed the agent to withhold $25,400 from the loan proceeds as payment for to IPG Investments for brokerage commissions due for loan origination services. Alanna's letter further directed the agent to wire those funds to the Smokiam Account. Instead, the closing agent First American instead issued a check payable to IPG Investments. Alanna wrote on the back of the check, "Pay to the order of Smokiam RV Resort," and Bradley endorsed the check with his signature. The $25,400 check was deposited into the Smokiam Account on May 2, 2016 (the "Cahill Transfer"). On April 30, 2016, immediately prior to the deposit of this commission, Smokiam had $76.88 in its account.

3.      On May 23, 2016, at the direction of Alanna, the closing agent wired the referral fee for the First McDonough Transaction into the Smokiam Account (the "First McDonough

Transfer"). Alanna testified she directed the monies there because Smokiam needed lots of construction work prior to the anticipated Memorial Day weekend opening.

4.      A letter dated May 17, 2016 from "IPG Investments" directed the closing agent to withhold from the loan proceeds on the Second McDonough Transaction $65,800 as payment to IPG Investments for brokerage commissions due for loan origination services."   The letter further instructed the agent to wire the funds to the Smokiam Account.  However, Ms. McDonough herself wired the $65,800 into the Smokiam Account on May 26, 2016 (the "Second McDonough Transfer").  This fee was the significant commission Alanna earned referenced in her attorney's May 31 email.  Again, Smokiam was in dire financial straits: as of May 25th, the Smokiam Account balance was down to $2,241.83.

5.      On July 26, 2016, the closing agent wired the fee for the Third McDonough Transaction into the Smokiam Account (the "Third McDonough Transfer").  On July 25, 2016, the day before the transfer, the balance in the Smokiam Account was $4,721.91.

6.      Alanna sent a letter directing the closing officer to wire the commission for the Arzola Transaction to the Smokiam Account, less a $25 wire-processing fee.  On August 18, 2016, Smokiam received a wire transfer of the $11,811 (the "Arzola Transfer").  On August 17th, the day before the transfer, the balance in the Smokiam Account was $17,167.20 due to a returned item of $22,925 earlier in the month.  Otherwise, the account balance would have been negative.

Alanna and Bradley worked together to complete these six transactions and generated total commissions of $174,301 from February 23, 2016, to August 18, 2016.  On each of these transactions, Bradley and Alanna determined that Bradley was the "originator" of the loan, and Alanna acted as the loan processor.  Alanna did not seek authority from the Court or the Trustee to transfer any of the IPG business income to Smokiam.

On the other two transactions that closed in 2016, Alanna received 100% of the commissions and fees earned by the IPG business.  Specifically, Alanna received $10,335 on or around March 2, 2016, for services related to the Mammoth Lake transaction, and $8,600 on or around July 15, 2016, for services related to the Ristick transaction.  The $18,935 Alanna

received as compensation from the Mammoth Lake transaction and the Ristick transaction were deposited into her personal account at Umpqua Bank, xxx8294 (the "Alanna's Account"). P-22.  Alanna received a Form 1099 reflecting $18,935 in nonemployee compensation for services to IPG.  Alanna and Bradley determined Alanna was the originator on these two transactions.  She also performed all of the processing services as well.  Alanna confirmed that she directed to closing agents in these two transactions to send the funds to Alanna's Account.

In sum, of the $193,236 that the IPG business generated, Alanna received only $18,935 in compensation.  There are no agreements or other records of her business transactions to explain how she and Bradley determined their respective incomes for IPG-related services or why they allocated to Bradley 100 percent of the income from the Keller, Cahill, First McDonough, Second McDonough, Third McDonough, and Arzola Transactions.  As result of the lack of an agreement or any documentation supporting the allocation decisions, the Court is unable to determine what portion of the $174,301 paid to Bradley and diverted to Smokiam was actually income earned by Alanna, who provided necessary services in connection with each of those six transactions.  Alanna admitted as much in her response to the Trustee's motion to convert (described below).  In that response, her attorney wrote that Alanna and Bradley work together on the IPG business and "take draws and commissions" but "it has been difficult to trace what funds are rightly her income and which funds are rightly the income of the non-debtor spouse…."  P-49.

Alanna contends her receipt of approximately $19,000 is about 10% of the total amount of IPG commissions, and that percentage is in line with industry standards for loan processors. The Court declines to accept this rationale.  First, there is no evidence that Alanna and Bradley attempted to provide her with about 10% of the income.  The Court finds that if Alanna received 10% of the total fees earned it was by pure happenstance.  Second, she performed 100% of the work on the Ristick and Mammoth Lake Transactions, so it made sense that she received 100% of the commissions.  Bradley, however, did not perform 100% of the work on the other six transactions, because Alanna processed all of those loans.  Both of them testified that processing services are necessary to close any transaction and generate a commission.  Bradley further noted

that if Alana did not perform the loan processing for IPG business, he would have had a bank process the loans—a bank certainly would not have provided those services for nothing. It bears repeating that Alanna acknowledged in her response to the conversion motion it was difficult to trace what funds are rightly her income. It was difficult to trace because they had no agreement or plan to allocate 10% of the IPG income to her.

H.  After Learning of the Diversion of Income to the Resort, the Trustee Immediately Moves for Conversion.

In August 2016, Alanna's counsel filed a Monthly Operating Report for May. P-50. The filed report indicates Alanna signed it on June 15. Mr. Feinstein testified that his office had Alanna complete the report back in June, but because the debtor no longer was responsible for these reports after the appointment of the Chapter 11 Trustee, they did not file it. He further testified that in July he had conversation with the Chapter 11 Trustee and agreed to file the report that had been prepared.

In attachment to the May Monthly Operating Report, Alanna revealed that she was diverting her income to the RV resort and explained why:

> In the month of May 2016 IPG Investments earned income in the amount of $93,770. Normally these funds would have deposited into our personal bank accounts. We deposited these into the Smokiam RV Resort business bank account for this month solely to help with the costs of completing the construction renovations that have been ongoing at the RV park in effort to finish the construction so that the business could be open and operational by Memorial Day to capture the busy summer business. That is to explain why these funds do not appear on our personal bank statements for the month of May. Once construction is completed and Smokiam RV Resort secures its bank loan refinance which is imminent any time now there will no longer be any need to contribute our personal incomes into the business and it can be self-sufficient.

P-50 at 4.

On September 1, 2016, the Trustee filed a motion to convert the Chapter 11 Case to chapter 7, and three weeks later the Court entered an order granting the motion (the "Chapter 7 Case"). The U.S. Trustee appointed the Trustee to serve as the trustee in the Chapter 7 Case.

I.  After Conversion, Alanna Asserts the Mortgage Business Commissions Constituted Bradley's Personal Income.

On October 7, 2016, Alanna filed her post-conversion schedules.  In her post-conversion Schedule A/B, Alanna provides new descriptions of two important assets.   With respect to IPG, she now provides a lengthy explanation of her interest in this property:

> IPG Investments (mortgage brokerage). This was an LLC but became inactive with Sec. of State, and now operates as a proprietorship of non-debtor spouse. Even though community property, this is husband's business; he is sole member. Since this is a service business, value is based on the personal services of Brad Ellis; there are very few "hard assets", so accounting value is just of those assets. Debtor works at business and gets about 10-15% of income from working part-time at the business; Brad gets 85-90%.

P-52 at 9.  She states her interest in IPG is still 100%, but now adds in a parenthetical that it is a "community asset."

In addition to the new description of her interest in the IPG business, Alanna now describes her interest in Smokiam as follows:

> Smokiam RV Resort LLC (husband's 100% member LLC). Husband is 100% member, but it is a community asset.  The LLC and/or Brad Ellis separately owns an RV trailer ($58,000) and dump truck ($10,000) at the RV Resort that Brad resides in while working at the resort; and the dump truck for construction and hauling garbage/construction (listed separately). Value of the real property is now about $2,677,000 based on a current appraisal as a 100% operating entity; RV resort is about 90% done, and if closed down value would plummet.  The value is the value of the land of $2,677,00; however, there are loans, mortgages, vendors, materialmen, and other debts of the LLC which total $3,072,887; which exceeds the value of the property and the "balance sheet" value of the LLC is a negative -$395,907.00.  As such, the debtor's interest of the current value of the LLC is -0-.

P-52 at 9.

In her post-conversion Schedule I, she no longer purports to be a "mortgage broker" but instead declares she is a "mortgage assistant."  On that revised schedule, she claims to receive $2,148.33 in net income from operating a business, and states Bradley receives $13,469.34 in net income from operating a business.  These numbers are the inverse of those in her original schedules, where she claimed she regularly receives $9,285 in monthly net income and that Bradley regularly receives $2,750 in monthly net income from operating a business.

MEMORANDUM DECISION - 14

With her post-conversions schedules, Alanna presents a very different financial picture. With respect to the dramatic change in income from the IPG business, she testified at trial that she relied on the language on the form that instructed her to estimate monthly income as of the date she filed the form. She stated that in January she expected nearly $10,000 from a transaction that fell through, while in October she expected $2,148 in commissions from a transaction. Alanna therefore concluded that she should state her monthly income was the amount she anticipated receiving that month.

The Court finds her testimony not credible. The language in Schedule I on which she allegedly relies requires the debtor to estimate *monthly income*, not state what the debtor anticipates making that one month. The specific instruction for answering Question 8a on that Schedule clearly requires the debtor to list all income *regularly received*. No reasonable, honest debtor whose income varies from month to month would conclude that he or she should list the amount expected in the one month the debtor files the form. Further, Alanna had been through six prior bankruptcy cases, four of them with counsel. She has completed this form multiple times and should know that Schedule I seeks the amount of income regularly received, not just a one-month snapshot. She had an attorney assisting her in this case as well. Simply put, her interpretation is unreasonable and unjustifiable, and she offered no testimony from anyone else supporting her alleged belief. Moreover, her initial Schedule I comports with her Statement of Current Monthly Income in which she declares her average monthly income for the six months before she filed was over $10,500. The Court finds Alanna intended to portray to creditors a healthy stream of income when she commenced the case but, upon conversion, changed her story to one where Bradley is entitled to the virtually all of the IPG income while her income is a fraction of what she represented at the outset.

With respect to the two key assets, Alanna testified that she was not changing her interests in the post-conversion schedules but instead was attempting to clarify her interests. However, she did not explain why her original schedules fail to identify IPG as a community asset but did describe Smokiam as "debtor and husband's 100% member LLC." She could have included the same language in her description of her interest in IPG, but did not. Her

representation in the original Schedule A/B that she owned 100% of IPG, her claim in the original Schedule I that she received over $9,200 per month in commissions from that business, and her emails to the Trustee describing her income from IPG all lead the Court to find that Alanna intended to mislead the Trustee and interested parties. At the beginning of the case, she wanted to create the impression that she was earning substantial commissions from the mortgage business. What she did not disclose was that virtually all of the income from the business went to Smokiam. After the Court converted her case, she flipped her position: she now contends that she believed she was not entitled to any of the income that went to Smokiam. By asserting this belief, Alanna confirms that she knowingly misled interested parties with her representations that she was earning substantial commissions.

As for Smokiam, she states in the post-conversions schedules that the value of the asset is now $0. Prior to conversion, she asserted a value of $1.6 million. Alanna testified that when she completed her original schedules she failed to take into account the debt on the resort when she calculated the value of the community's interest in the LLC. The Court again finds her testimony is not credible. She has been through several bankruptcy cases, had been involved in the mortgage business for decades, and an attorney represented her when she filed the original schedules. She knew to list the asset under business property rather than real estate. Thus, she knows the difference between an interest in real property and an interest in a business that owns real property, and she must know that a valuation of the business must include its liabilities. The Court concludes that, at the outset, Alanna substantially overstated the value of the resort to give the false impression that Smokiam was a valuable asset and declared its true value only after her case was converted.

Alanna argued that everyone knew from the beginning that she was going to devote her income to the RV resort. Her attorney, Larry Feinstein, testified about an alleged "game plan" for Alanna. He stated that Smokiam was on a construction loan and Bradley and Alanna wanted to generate income to take to a lender to obtain permanent financing. They thus needed to devote their income from the mortgage business to the RV resort to complete the renovations. After obtaining permanent financing, Bradley and Alanna expected Smokiam to generate income

and distribute profits to Bradley as the sole interest holder. The last piece of this plan, according to Mr. Feinstein, was that Alanna would then use these community monies to fund her plan.

However, the record is devoid of evidence showing that Alanna or her lawyer explained this so-called game plan to the Trustee. Further, if Alanna planned from the outset to invest all IPG income in Smokiam and then use profits from the RV resort for her reorganization, then she should have told Bradley of her purported plan, as she asserted at trial that Bradley was the owner of Smokiam. Bradley testified, however, that she filed her case completely without his knowledge—he learned of the filing when he received the bankruptcy notice in the mail. Further, she repeatedly testified that Bradley exercised complete control over the disposition of IPG income. If true, then she knew she could not formulate a plan that relied on the use of IPG commissions because she had no ability to determine the use of those funds.

Furthermore, contrary to her testimony at the meeting of creditors, Alanna did cause Smokiam to pay her personal expenses prior to filing bankruptcy. For example, Smokiam paid for a trip to Disneyland in August 2015. While Alanna claimed the trip was all business because they were investigating a business opportunity and researching other RV resorts, Bradley conceded that at least 10% of the trip expenses were personal in nature. Alanna also conceded that other payments that month to All Star Liquors, Total Wine and More, Bare Essentials, Sports Clips, clothing stores, iTunes, Lego Store, and Tiger Mountain Kennels might have been personal. P-56. The Court finds that clearly some of those charges were personal and not related to Smokiam's business.

In short, the Court finds that Alanna intentionally misled her creditors and the Trustee about her financial condition and concealed the diversion of compensation to which she was entitled for services provided for the mortgage business. Prior to conversion, she wanted the Trustee to believe that she was able to fund a "super chapter 13" plan using her income from the IPG business, and she did not disclose that virtually all of the IPG income was going to prop up a struggling RV resort. After conversion, Alanna claims that it was always the plan to use all IPG income to fund the RV resort and that she was never entitled to any of the monies that went to Smokiam anyway because Bradley had decided those monies constituted his personal income.

## II.   CONCLUSIONS OF LAW

A.   Jurisdiction and Authority.

This Court has jurisdiction by virtue of 28 U.S.C. § 1334(b).  This matter is a core proceeding described by 28 U.S.C. § 157(b)(2)(I).  The U.S. Trustee affirmatively consented to this Court entering final orders and judgments.  Dkt. No. 4.  Alanna failed to file a Notice Regarding Final Adjudication and Consent as required by the Local Rules of Bankruptcy Procedure for the Western District of Washington.  Failure by a party to file such a notice constitute that party's consent to entry of final orders or judgments by the bankruptcy judge.  LBR 9012-1(c).  Further, Alanna filed a motion for summary judgment and obtained partial summary judgment, and she has never withheld her consent to the entry of final orders or judgments by this Court.  The Court thus concludes that Alanna has consented to this Court entering final judgment in this adversary.

B.   Alanna's Transfer of Estate Property Warrants Denial of a Discharge.

The party seeking to deny a debtor's discharge under § 727(a)(2)[4] must prove two things: "(1) a disposition of property, such as transfer or concealment, and (2) a subjective intent on the debtor's part to hinder, delay or defraud a creditor through the act [of] disposing of the property."  *In re Retz*, 606 F.3d 1189, 1200 (9th Cir. 2010) (*citing In re Lawson*, 122 F.3d 1237, 1240 (9th Cir. 1997)).  A "transfer" is defined as "each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with (i) property; or (ii) an interest in property."  11 U.S.C. § 101(54)(D).  A transfer includes a withdrawal from a bank account.  *In re Haag*, 584 F. App'x at 621 (citing *In re Bernard*, 96 F.3d 1279, 1282–83 (9th Cir. 1996)).  The deposit of funds into a bank account by a debtor is also a transfer.  *In re Cooper*, 2014 WL 4467067, at *6 (Bankr. N.D. Cal. Sept. 10, 2014).  A concealment can also justify

---

[4] 11 U.S.C. § 727(a)(2) provides that the court shall grant the debtor a discharge, unless-
......
 (2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed-
      (A) property of the debtor, within one year before the date of the filing of the petition; or
      (B) property of the estate, after the date of the filing of the petition.

denial of discharge under § 727(a)(2). Concealment includes "preventing discovery, fraudulently transferring, or withholding knowledge or information required by law to be made known." *United States v. Turner*, 725 F.2d 1154, 1157 (8th Cir. 1984).

Section 727(a)(2) requires a subjective intent on the debtor's part to hinder, delay or defraud a creditor or the chapter 7 trustee. "Denial of discharge, however, need not rest on a finding of intent to defraud. Intent to hinder or delay is sufficient." *Bernard*, 96 F.3d at 1281 (emphasis in original); *In re Ereren*, 2013 WL 2321917, at *4 (B.A.P. 9th Cir. May 28, 2013) ("[A] finding of intent to hinder or delay or defraud is sufficient to deny discharge under § 727(a)(2).").

First, a material amount of the $174,301 diverted to Smokiam constituted income earned by Alanna and property of the chapter 11 bankruptcy estate. Alanna stated in the bankruptcy schedules filed after conversion to chapter 7 that she "gets about 10-15%" of the income from IPG-related services. Bradley has also testified that a loan processor typically receives about 10% of commissions/fees for loan processing services. The Court thus concludes that Alanna was entitled to at least 10% of the $174,301 in commissions generated by the IPG business for the services she provided. Accordingly, at least $17,430 of her income was directed to Smokiam.

Furthermore, some portion of the commissions is attributable to the goodwill and customer relationships formed by Bradley and Alanna over the years prior to this case. While Alanna's expert testified that Bradley's efforts to originate clients generated all IPG income, the Court does not agree that goodwill acquired over time has no value. In fact, Bradley testified that if a competing loan broker had asked for his client database, he would have said no because it is a valuable asset that he worked to develop. Since Bradley formed the IPG business after he married Alanna, any goodwill of IPG, even if IPG is Bradley's sole proprietorship, is a community asset.[5] Alanna was not free to give away the income generated by this community

---

[5] Washington is a community property state, and property acquired during the marriage is presumed to be community property. RCW § 26.16.030; *Seizer v. Sessions*, 132 Wash.2d 642, 653, 940 P.2d 261, 266 (Wash. 1997). "When an individual does business as a sole proprietorship, the individual and the sole proprietorship are legally indistinguishable. An individual does not create a separate legal entity by doing business as a sole proprietor." *Bankston v. Pierce County*, 174 Wash. App. 932, 937, 301 P.3d 495, 497 (Wash. App. 2013) (internal

asset. Because the Court concludes that some of the diverted income was property of the estate, the Court need not determine if the balance of those funds constitutes Bradley's personal income that is not property of the estate.

Second, Alanna, with intent to hinder, delay, or defraud a creditor or the Trustee, transferred property of the estate after the date of the filing of the chapter 11 petition. Specifically, she transferred portions of the (a) Keller Transfer, (b) Cahill Transfer, (c) First McDonough Transfer, (d) Second McDonough Transfer, (e) Third McDonough Transfer, and (f) Arzola Transfer, that constituted (i) compensation for the personal services Alanna provided on each transaction and (ii) the estate's interest in the goodwill and client relationships developed for the mortgage business (collectively the "Transfers"). Alanna did not timely disclose the Transfers and did not seek Court authority for the Transfers.

It important to note that, with the exception of the Keller Transfer, each of the other Transfers to Smokiam occurred *after* the Court determined on April 27, 2016, that cause existed to appoint a trustee in the Ch. 11 Case. Alanna's decision not to inform the Trustee that she was transferring her income to the RV resort is unjustifiable. The Court further notes that the Transfers were made to Alanna's non-debtor spouse and his company Smokiam and Alanna maintained control over the Transfers since she wrote all of Smokiam's checks and paid Smokiam's bills.

Alanna's repeated pre-conversion representations that *she* was earning significant commissions for IPG work belie her current contention that she had a good-faith belief that all of these transfers were Bradley's income. The Court concludes that Alanna knew that at least some portion of these commissions belonged to the estate, so she concealed their disposition for as long as she could in order to complete the renovations at the RV resort. Alanna's concealment of the Transfers constitutes grounds to deny her discharge under 11 U.S.C. § 727(a)(2).

---

citations omitted). Therefore, any property of the sole proprietorship acquired during the marriage is presumed to be community property.

MEMORANDUM DECISION - 20

C.   Alanna's Failure to Provide a Reasonable Explanation for Receiving No Compensation for Her Services Warrants Denial of a Discharge.

The purpose of § 727(a)(3)[6] "is to make discharge dependent on the debtor's true presentation of his financial affairs." *In re Caneva*, 550 F.3d 755, 761 (9th Cir. 2008).  Section 727(a)(3) "strikes a balance, where the focus is on the kind of recordkeeping that would allow a bankruptcy court to conduct a fair and expedient distribution of a debtor's assets." *In re Kran*, 493 B.R. 398, 404 (Bankr. S.D.N.Y. 2013) *aff'd*, 760 F.3d 206 (2d Cir. 2014) (quoting *In re Martin*, 554 F.2d 55, 57–58 (2d Cir. 1977)).  To meet its initial burden under § 727(a)(3), the U.S. Trustee must offer evidence of the general nature of the Defendant's business or personal financial position and the types of transactions about which recorded information is sought.  *In re Weingarten*, 2013 WL 309061, at *4–5 (Bankr. C.D. Cal. Jan. 25, 2013) (quoting *Strzesynski v. Devaul (In re Devaul)*, 318 B.R. 824, 830–34 (Bankr. N.D. Ohio 2004), *reconsid. denied*, 2004 WL 3079733 (Bankr. N.D. Ohio Nov. 24, 2004)).  Second, the U.S. Trustee must present evidence of recorded information that Alanna allegedly concealed, destroyed, mutilated, falsified, or failed to keep or preserve.  *Id.*  Finally, the U.S. Trustee must show how the missing recorded information is necessary to ascertain the Alanna's actual financial condition or business transactions under the circumstances of the case.  *Id.*

When a debtor is sophisticated and carries on a business involving substantial assets, "Creditors have an expectation of greater and better record keeping."  *Caneva*, 550 F.3d at 762 (citing *In re Juzwiak*, 89 F.3d 424, 428 (7th Cir. 1996)).  The Ninth Circuit has held that "when a debtor transfers a substantial amount of money to a third party, the failure to keep any documentation evidencing the terms of the transfer" establishes a prima facie violation of § 727(a)(3).  *Id.* at 762.  Bankruptcy courts have broad discretion "in determining whether a debtor's records are sufficient under § 727(a)(3)."  *In re Jackson*, 453 B.R. 789, 796 (Bankr. E.D. Pa. 2011).

---

[6]  11 U.S.C. §727(a)(3) provides that the court shall grant the debtor a discharge, unless
……
(3) the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case.

MEMORANDUM DECISION - 21

Alanna has worked in the mortgage industry for decades as a processor and as a loan originator and thus must understand the importance of recordkeeping. Given her multiple prior filings with counsel, Alanna was well aware of her duties to preserve and disclose financial information. Yet Alanna failed to account for the income she earned for services she provided during the Chapter 11 Case as Bradley's assistant or loan processor on the six transactions described above. Alanna and Bradley had no agreement or understanding on her compensation for her services in connection with the IPG business. She even acknowledged that she is unable to trace what funds earned are "rightly her income." P-49. Consequently, it is impossible to ascertain her financial condition and business transactions. The Court concludes this failure to maintain records was not justified under the circumstances. Alanna's unjustified failure to keep records from which her financial condition and business transactions could be ascertained constitutes grounds to deny her discharge pursuant to 11 U.S.C. § 727(a)(3).

D.      Alanna's False Statements Constitute Grounds to Deny Her a Discharge.

The purpose of § 727(a)(4)(A)[7] "'is to ensure that dependable information is supplied to those interested in the administration of the bankruptcy estate so that they can rely upon it without the need for the trustee or other interested parties to dig out these true facts in examination or investigations;' the opportunity to obtain a fresh start is thus conditioned upon truthful disclosure." *In re Aubrey*, 111 B.R. 268, 274 (B.A.P. 9th Cir. 1990) (*quoting In re Martin*, 88 B.R. 319, 323 (D. Colo. 1988)). To sustain an objection to discharge under § 727(a)(4)(A), the plaintiff must show that: (a) the debtor made a false oath in connection with the case; (b) the oath related to a material fact; (c) the oath was made knowingly; and (d) the oath was made fraudulently. *In re Retz*, 606 F.3d at 1197. A debtor's false oath may involve an affirmatively false statement or an omission. *Fogal Legware of Switz., Inc. v. Wills (In re Wills)*, 243 B.R. 58, 62 (B.A.P. 9th Cir. 1999). A false oath is complete when made. *In re Searles*, 317 B.R. 368, 377 (B.A.P. 9th Cir. 2004). A prompt correction, or lack thereof, may be probative of fraudulent intent. *Id.*

---

[7]  11 U.S.C. § 727(a)(4)(A) provides that the court shall grant the debtor a discharge, unless the debtor knowingly and fraudulently, in or in connection with the case made a false oath or account.

MEMORANDUM DECISION - 22

Courts define materiality broadly. A false statement is "material" if it bears a relationship to the debtor's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of the debtor's property. *In re Khalil*, 379 B.R. 163, 173 (B.A.P. 9th Cir. 2007). A false statement or omission may be material even if it does not cause direct financial prejudice to creditors. *In re Wills*, 243 B.R. at 63. An omission or misstatement that "detrimentally affects administration of the estate" is material even where it involves an asset with little value or that was not property of the estate. *Id*. at 63–64. The Court need not find impact on the estate or administration of the estate for a false statement or omission to be material. *In re Kluge*, 2013 WL 1459274, at *5 (B.A.P. 9th Cir. April 10, 2013).

A debtor acts knowingly if he or she acts deliberately and consciously. *In re Retz*, 606 F.3d at 1198. A debtor's fraudulent intent is usually proven by circumstantial evidence or by inferences drawn from the debtor's conduct. *Id*. at 1199. An oath or omission is fraudulently made when the debtor makes a misrepresentation or an omission that at the time he or she knew was false with the intention and purpose of deceiving creditors. *In re Khalil*, 379 B.R. at 173. In considering whether the requisite intent is present, the court can consider if there has been a pattern of falsity or a debtor's reckless indifference to or disregard of the truth. *In re Retz*, 606 F.3d at 1198–99.

The disclosure of secreted assets at or before the meeting of creditors, or after through amendments, does not insulate a debtor from a finding of fraudulent intent with respect to false oaths in his or her original bankruptcy documents. *AutoSource Capital, Inc. v. Traina (In re Traina)*, 501 B.R. 379, 384 (Bankr. N.D. Cal. 2013). "Moreover, failing to rectify inconsistencies and omissions when filing amended schedules may be weighed in favor of finding the requisite intent to deceive." *Id*. at 386. Amending bankruptcy schedules to disclose material facts after those facts come out at a meeting of creditors do not preclude denial of discharge: "foxhole conversions are not necessarily convincing, and disclosures made after a debtor realizes exposure is imminent do not absolve fraud." *Hansen v. Moore (In re Hansen)*, 368 B.R. 868, 877 (B.A.P. 9th Cir. 2007).

Alanna's intentionally false and misleading statements and omissions include the following:

1.      Alanna asserted on initial Schedule A/B that (a) she owns 100% of IPG Investment, LLC, and (b) she and her husband both own Smokiam, with a value of $1.6 million.

2.      Alanna asserted on initial Schedule I that she personally has total, regular monthly net income of $10,946, including $9,285 from the operation of a business and further stated Bradley had only $2,750.35 in net monthly income from operating a business.

3.      Alanna stated on her Chapter 11 Statement of Your Current Monthly Income that her monthly gross wages, salary, tips, bonuses, overtime, and commissions totaled $10,522.36.

4.      Alanna confirmed at the meeting of creditors held in the Ch. 11 Case her receipt of regular monthly net business income listed on the initial Schedule I of $9,285 from the IPG business.

5.      Alanna testified at the meeting of creditors held in the Ch. 11 Case that the Smokiam Account was never used to pay personal or family expenses.

6.      Alanna again asserted on her amended Schedule A/B that she owns 100% of IPG Investments, clarifying that is it no longer an LLC.  She also changed her position on ownership of Smokiam, from her and Bradley owning it to it being 100% Bradley's entity.

7.      On her post-conversion Schedule I, Alanna significantly revised the net monthly income from operation of a business, claiming her regular income was $2,148, and Bradley's income was $13,469.40.

8.      Alanna did not disclose on the February Monthly Operating Report, or on any other monthly operating report, that $55,500 in commissions earned from the Keller Transaction was transferred to Smokiam.

Alanna made these numerous false statements as part of a scheme to deceive the Trustee and creditors into believing she had substantial income from IPG to fund a "super chapter 13 plan" and then directing that income into a fledgling RV resort for a long as she could.  After conversion of her case, she argued (and continues to argue) vociferously that the IPG income constituted Bradley's income rather than hers—confirming that her multiple pre-conversion

statements about her income were false and intended to mislead. The statements were material because they prevented the Trustee and creditors from knowing her true financial condition, thus allowing her to divert estate assets for many months. Alanna's false statements constitute grounds to deny her discharge under section 727(a)(4).

### III.  CONCLUSION

For the reasons stated above, the U.S. Trustee is entitled to a judgment denying the Defendant's discharge under each of 11 U.S.C. § 727(a)(2), (a)(3), and (a)(4). The Court will enter a separate judgment, pursuant to Federal Rule of Bankruptcy Procedure 7058 and Federal Rule of Civil Procedure 58, consistent with this Memorandum Decision.

/// END OF MEMORANDUM DECISION ///